

# THE ATTORNEY GENERAL
# OF TEXAS

## AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

August 5, 1958

Hon. Leroy Jeffers, Chairman
The Board of Regents
The University of Texas
Esperson Building
Houston 2, Texas

Opinion No. WW-484

Re: The authority of the Board of
Regents of The University of
Texas to invest the Permanent
University Fund in first lien
real estate mortgage securities,
to contract with correspondent
loan agents in various sections
of Texas for the servicing of such
loans, and to pay such costs as are
incidental to a program of this na-
ture.

Dear Mr. Jeffers:

Your request for an opinion states, in part, that

"The University of Texas contemplates entering in contracts
with mortgage loan correspondents in various sections of
Texas, and in these contracts the correspondents, among
other things, will agree to furnish the following services:

1. Collection of principal and interest as it matures;

2. Collection of required reserves for the payment of
accruing ad valorem taxes against the mortgaged
property; future hazard insurance premiums and
future FHA insurance premiums;

3. Maintenance of detailed records of all payments
made by borrower and of all disbursements out of
reserve accounts;

4. Payment of all ad valorem taxes against mortgaged
property as they become due;

5. Payment of all premiums for hazard insurance on mortgaged property as they become due;

6. Payment of FHA insurance premium as it becomes due;

7. Make a report on all delinquencies which may occur;

8. Secure and properly check renewal hazard insurance policies;

9. Make an annual inspection of each mortgaged property with a report to the University;

10. Supervise and assist the University in the event of any required foreclosure proceedings;

11. When necessary, manage for the account of the University any foreclosed properties;

12. Render full assistance to the University in the delivery of the foreclosed property to FHA in exchange for debentures.

The University will not pay in excess of the standard current rate for these services rendered by correspondents. This rate is currently 1/2 of 1% annually on the declining principal balance, payable only when interest is collected, which will be withheld from the income normally deposited to the Available University Fund."

and closes with the following question:

"Does The University of Texas have the authority to contract with correspondents in various sections of Texas for the servicing of first lien mortgage loans and pay such costs as are incidental to a program of this nature in fulfilling the requirements of Section 11a of Article 7 of the Constitution?"

The items numbered 2, 6 and 12 in your question imply that the first lien mortgage loans inquired about will be insured by "payment of FHA insurance premium as it becomes due." Upon further inquiry we are informed

that your question contemplates only those mortgages which are insured
by the Federal Housing Administration under Section 203 of the National
Housing Act, as amended, and this opinion is limited to such mortgages.

The basic question presented is whether or not such an invest-
ment of the Permanent University Fund is one permitted by the following
language of Section 11a of Article VII of the Constitution of Texas:

> ". . ., the Permanent University Fund may be invested
> in first lien real estate mortgage securities guaranteed
> in any manner in whole by the United States Government
> or any agency thereof . . .;"

Are such mortgages "guaranteed . . . in whole" as so required?

The National Housing Act, codified as 12 U.S.C.A., Secs. 1701, et
seq., and hereinafter referred to as the "Act," as enacted and amended many
times by Congress, is very voluminous. To the law has been added many
hundreds of rules, regulations and procedures prescribed by the Federal
Housing Commissioner, who is empowered to administer the Act.

To quote verbatim Section 203 and all of the many lengthy subse-
quent sections of the Act pertaining to these mortgages, would unduly pro-
long this opinion. It will suffice here to quote briefly from the Act and from
an official publication of rules. and regulations of the Federal Housing Com-
missioner entitled "FHA Mortgagee's Handbook," consisting of 1,510 num-
bered paragraphs, to which we will refer as the "Handbook."

In determining whether the "insurance" of such mortgages by FHA
is sufficient to render them "guaranteed . . . in whole" for the benefit of the
Permanent University Fund, it should first be noted that the following appears
in the Act in Section 203:

> ". . .
>
> "(b) To be eligible for insurance under this section a mort-
> gage shall -
>
> (1) have been made to, and be held by, a mortgagee ap-
> proved by the Commissioner as responsible and able
> to service the mortgage properly.
>
> ". . ."

Assuming that such approval would be forthcoming and the Fund is invested in such a mortgage, what is the protection afforded to the Permanent University Fund by FHA in event of default and when it becomes necessary to foreclose?

Section 1102 of Chapter XI of the Handbook, entitled "Procedures after Default," states, in part:

"All approved mortgagees are required to service insured mortgages in accordance with practices acceptable to prudent lending institutions. It is expected that in the event of default the mortgagee will be able to communicate readily with the mortgagor and will exercise diligence in attempting to obtain payment in accordance with the terms of the mortgage. Proper servicing of the mortgage is, of course, the responsibility of the mortgagee and is not a function to be assumed by FHA insuring offices . . ."

Thus, it is apparent that it would be the duty of the mortgagee (the University) to "service" the mortgage and to bear the expenses of attempting to collect delinquent monthly installment payments owed by the mortgagor, and to defray the costs and expenses incident to foreclosure proceedings, among other things.

How much of these costs and expenses are to be borne by the "correspondent" mortgage banker who "currently" would receive 1/2 of 1% annually on the declining principal balance for the services specifically enumerated in the request for our opinion, and how much would be borne by the Permanent University Fund?

The twelve items listed in the request indicate that the Fund would bear all costs and expenses of collecting delinquent installment payments (Item 1 covers only the collection of principal and interest "as it matures"). Items 10, 11, and 12 clearly show that the University would conduct and pay the costs and expenses incident to foreclosure and conveyance of the foreclosed property to FHA (the correspondent mortgage banker "supervising and assisting"), and when necessary the University would pay the correspondent mortgage banker an unstated amount to manage any foreclosed properties ("for the account of the University" we take to mean "at the expense of the University").

This interpretation of items 10 and 12 clearly follows from the language used and is consonant with general law in that most of the necessary steps in foreclosure and in delivering the foreclosed property to FHA in exchange for debentures constitute the practice of law and may not lawfully be performed for a fee by a correspondent mortgage banker not licensed as an attorney.

If the mortgagee forecloses and takes possession of the mortgaged property in a manner satisfactory to the Commissioner, and if such property is conveyed to the Commissioner promptly in a manner satisfactory to him, the mortgagee is entitled to receive payment of the FHA "insurance" in a combination of FHA debentures, cash up to $50.00, and a "Certificate of Claim." No time limit is imposed upon the Commissioner as to when this transaction shall be consummated, and the mortgagee is to receive this relief.

This procedure is outlined in Section 204 of the Act, as follows:

> "Sec. 204. (a) In any case in which the mortgagee under a mortgage insured under section 203 shall have foreclosed and taken possession of the mortgaged property in accordance with regulations of, and within a period to be determined by, the Commissioner, or shall, with the consent of the Commissioner, have otherwise acquired such property from the mortgagor after default, the mortgagee shall be entitled to receive the benefit of the insurance as hereinafter provided, upon (1) the prompt conveyance to the Commissioner of title to the property which meets the requirements of rules and regulations of the Commissioner in force at the time the mortgage was insured, and which is evidenced in the manner prescribed by such rules and regulations, and (2) the assignment to him of all claims of the mortgagee against the mortgagor or others, arising out of the mortgage transaction or foreclosure proceedings, except such claims as may have been released with the consent of the Commissioner. Upon such conveyance and assignment the Commissioner shall issue to the mortgagee debentures having a total face value equal to the value of the mortgage and a certificate of claim, as hereinafter provided. For the

purposes of this subsection, the value of the mortgage shall be determined, in accordance with rules and regulations prescribed by the Commissioner, by adding to the amount of the original principal obligation of the mortgage which was unpaid on the date of the institution of foreclosure proceedings, or on the date of the acquisition of the property after default other than by foreclosure, the amount of all payments which have been made by the mortgagee for taxes, ground rents, and water rates, which are liens prior to the mortgage, special assessments which are noted on the application for insurance or which become liens after the insurance of the mortgage, insurance on the mortgaged property, and any mortgage insurance premiums paid after either of such dates, and any tax imposed by the United States upon any deed or other instrument by which said property was acquired by the mortgagee and transferred or conveyed to the Commissioner, and by deducting from such total amount any amount received on account of the mortgage after either of such dates, and any amount received as rent or other income from the property, less reasonable expenses incurred in handling the property, after either of such dates . . ."

" . . . And provided further . . . with respect to any mortgage accepted for insurance under section 203 . . . there may be included in the debentures issued by the Commissioner on account of the cost of foreclosure (or of acquiring the property by other means) actually paid by the mortgagee and approved by the Commissioner an amount, not in excess of two-thirds of such cost or $75 whichever is the greater . . ." (Emphasis added)

It should be noted in the above quotation from the Act that the "value of the mortgage" is to be determined "in accordance with rules and regulations prescribed by the Commissioner" by applying the formula given. FHA debentures having a total face value equal to this "value of the mortgage," plus an allowance (which never exceeds $75.00) on mortgagee's foreclosure expenses, or other expenses of acquiring the property, are then issued to the mortgagee.

It should be stated here that these FHA debentures are not worth their face value on the present market but may be sold at this time only at a heavy discount from such face value. Further, Section 204 (d) of the Act provides that the debentures shall bear interest "at a rate determined by the Commissioner" but never to exceed "3 per centum per annum," whereas the original mortgage bore interest at the rate of five (5) per cent. Also, such debentures "shall mature twenty years after the date thereof."

That the total face value of the debentures, plus the "cash adjustment", may not be sufficient to make the mortgagee whole is very evident from the following quotation from Section 204(e) of the act:

> "The certificate of claim issued by the Commissioner to any mortgagee shall be for an amount which the Commissioner determines to be sufficient, when added to the face value of the debentures issued and the cash adjustment paid to the mortgagee, to equal the amount which the mortgagee would have received if, at the time of the conveyance to the Commissioner of the property covered by the mortgage, the mortgagor had redeemed the property and paid in full all obligations under the mortgage and a reasonable amount for necessary expenses incurred by the mortgagee in connection with the foreclosure proceedings, or the acquisition of the mortgaged property otherwise, and the conveyance thereof to the Commissioner. . ."

It is obvious that issuance and payment of the "Certificate of Claim" may be necessary, in addition to the debentures and the "cash adjustment," in order to place the mortgagee University in the position it would have been had the mortgagor fully discharged its obligations under the mortgage.

But neither the FHA nor anyone else is bound to pay this "Certificate of Claim." It may be paid in full, it may be partially paid, or it may never be paid at all. Collection of this Certificate by the University mortgagee depends entirely upon the results of the sale of the mortgaged property by the Commissioner, when and if it is sold. If the proceeds of such sale, which is conducted solely by the Commissioner under his rules and regulations, produces an excess after certain charges, deductions and expenses are subtracted, then such excess may be used to pay, or partially pay, the Certificate of Claim. In any event, the Certificate is eventually subject to "voidance and termination"

by the Commissioner. (Section 204(f) of the Act and portions of the Handbook quoted below)

> Section 1125 of the Handbook makes this statement:
>
> "The certificate of claim is issued as of the date of conveyance of title to the FHA in an amount sufficient to equal all amounts due under the mortgage not covered by the amount of the debentures. . . ."

And Section 1154 describes the fate of the "Certificate of Claim" in this language:

> "The certificate of claim shall become void and of no effect (a) upon the payment of such excess as provided above (whether it liquidates the certificate in part or in full), or (b) upon the failure of the Commissioner to realize any excess upon the full liquidation of the property. Upon the liquidation of the property the Commissioner shall notify the registered holder of the certificate by mail at the post office address as shown by the records of the Commissioner, of the disposition of the proceeds and of the voidance and termination of the certificate of claim."

Although the Texas courts have not construed the phrase "guaranteed . . . in whole", we view its meaning as too plain to require construction. The ordinary meaning of the word "guarantee" is that some one else is primarily liable for a debt and that the guarantor will pay it if the primary debtor does not. Charleston Five Cents Savings v. Wolf, 36 N.E. 2d 390, 392; 309 Mass. 547. And the word "whole", as defined in Webster's New International Dictionary, Unabridged, 1957, at page 2,921, means "containing all its constitutent or integral parts or elements; having nothing lacking or taken away; full; entire."

We conclude that the mortgages inquired about are not "guaranteed . . . in whole" for the reason that the mortgagee University may never collect in money all that it is entitled to collect under the mortgage itself. While the FHA insurance arrangement may pay a major portion of the University's loss, and in times of economic prosperity may pay it all, there is no "guarantee" of this and such mortgages do not satisfy this constitutional requirement.

If in the future the National Housing Act is amended so as to provide such a "guarantee", then it should be noted that the Board of Regents may not exceed certain limitations in authorizing expenditures for administering the Permanent University Fund. The acquisition, servicing and liquidation of such mortgages would be included in such administrative expenses. These limitations are contractually imposed in certain bond resolutions authorizing the issuance of outstanding bonds of the Permanent University Fund. For example, on page 13 of the bond resolution authorizing the Board of Regents of the University of Texas Permanent University Fund Refunding Bonds, Series 1958, in the amount of $5,076,000.00, there appears the following:

> "16. That the Board of Regents of the University of Texas covenants and agrees as follows:
>
> . . .
>
> "(b) That it will restrict expenditures for administering the Fund to a minimum consistent with prudent business judgment and that such expenditures, chargeable before debt service requirements, shall never exceed in any year an amount equal to 1/5 of 1% of the book value of the Permanent University Fund."

## SUMMARY

The first lien real estate mortgage securities inquired about are not guaranteed in whole as required by Section 11a of Article VII of the Constitution of Texas and are not eligible as an investment of the Permanent University Fund of the University of Texas.

Very truly yours

HWM-s

APPROVED:

OPINION COMMITTEE
Geo. P. Blackburn, Chairman
Grundy Williams
J. Milton Richardson
Morgan Nesbitt
Henry G. Braswell

REVIEWED FOR THE ATTORNEY GENERAL
By: W. V. Geppert

WILL WILSON
Attorney General of Texas

By _Howard H. Mays_
Howard W. Mays
Assistant